JULES S. BACHE et al.

*v.*

CENTRAL LEATHER COMPANY et al.

[Submitted February 28th, 1911. Decided March 3d, 1911.]

1. A preliminary injunction will not be granted restraining the defendants from voting at the annual stockholders' meeting for the election of directors proxies upon fifty-two thousand four hundred and thirty out of seven hundred and twenty-nine thousand nine hundred and eighty outstanding shares of stock, upon the ground that there had been a severance of the right to vote from the vested title to and ownership of the stock, where it appeared that if the questioned shares be deducted from the four hundred and seventy-six thousand five hundred shares for which the defendants had proxies, there would still be left to them proxies for four hundred and twenty-four thousand and seventy shares against which nothing was alleged, or nearly sixty thousand shares more than a majority.

2. The nature and characteristics of a proxy explained.

3. A master of this court will not be appointed to supervise such election on the ground that inspectors of election had been appointed by the present board of directors and were mere employes of the company, subject to the direction of its officers and without independent judgment in deciding upon the admission or rejection of a challenged vote.

4. The powers and duties of such inspectors of election defined.

On motion for a preliminary injunction.

*Mr. Robert H. McCarter* and *Mr. Henry Wollman* (of the New York bar), for the complainants.

*Mr. Richard V. Lindabury* and *Mr. Edward M. Shepard* (of the New York bar), for the defendants.

HOWELL, V. C.

The complainants are stockholders of the Central Leather Company; they seek by their bill to interfere with the annual

meeting of the stockholders originally called for February 23d, 1911, by enjoining the defendants from voting thereat upon certain shares of stock, and to have the election of directors supervised by a master in chancery. The company was organized under the New Jersey General Corporation law with an authorized capital of $80,000,000, divided equally between common stock and preferred cumulative stock carrying a dividend of seven per cent. annually. Of this authorized issue there are now outstanding seven hundred and twenty-nine thousand nine hundred and eighty shares, of which the complainants own and represent about one hundred and eighty thousand shares. As the time for the annual meeting approached, the officers and directors for the current year sought proxies from the other stockholders to be voted on at the annual meeting; they have succeeded in securing proxies for voting four hundred and seventy-six thousand five hundred shares, which, it will be observed, is an amount largely in excess of one-half of the stock issued and outstanding. I assume that these figures are correct, because they are stated substantially in the same way in a circular letter addressed by the proxy committee to the stockholders of the company which is copied and included in the complainants' affidavits, and therefore relied upon by them, and stated also unequivocally in the affidavits filed on behalf of the defendants. If these facts were all the facts in the case, it would be difficult to see how any injunction could lawfully issue to prevent the voting of any or all of the shares for which the present administration holds the proxies. The complainants, however, allege that there are fifty-two thousand four hundred and thirty shares for which the proxy committee holds proxies which have no right to be voted by proxy for the reason that there has been a severance of the right to vote from the vested title to and ownership of the stock. It is said that the defendants, or some of them, borrowed shares from other shareholders and had them transferred on the company's books in the names of persons who were friendly to the management who then gave proxies to vote upon these shares, and that immediately thereafter the certificates for shares were returned to the true owners. In the meantime the directors, by resolution, closed the transfer books so that it became impossible to have the stock

retransferred into the names of the owners, and so the proxy committee are enabled to vote upon this stock at the annual meeting without regard to the wishes of the true owner. And the position is aggravated, the complainants say, by the fact that they have become the purchasers in the meantime of four hundred and sixty shares of this very stock which now belongs to them and which they allege will be voted against them at the annual meeting, and that they have no recourse whatever. I am of the opinion that it is unlawful, and a gross violation of the public policy of this state to permit or contract for a separation of the voting power of corporate stock from its ownership. If a stockholder executes a proxy, the person to whom it runs is the stockholder's agent, and he must vote in accordance with the instructions given either openly or tacitly to him by the real owner of the shares. The agency is of such a character that it may be abrogated by the appearance of the shareholder in person at the meeting, or by the execution of a subsequent proxy which would cancel the former one, the whole situation being entirely under the control of the stockholder himself. The situation as to the stock complained of in this case is very different. Here the stockholder has divested himself of the right to vote at stockholders' meetings and has sold the right or given it away to persons who may vote it wholly in opposition to his wishes, and thus the power to appoint a proxy degenerates from a scheme for the best method of conducting the business of the company into a mere device for maintaining the control. The real stockholder, at the stockholders' meetings, has a right to have the other real stockholders present in person or by proxy for the purpose of considering the well being of the company. This result is not reached when the contest is one which is waged merely for control without regard to the best interests of the corporation. The authorities are *Cone* v. *Russell, 48 N. J. Eq. (3 Dick.) 208; Guernsey* v. *Cook, 120 Mass. 501; Woodruff* v. *Wentworth, 133 Mass. 309; Warren* v. *Pim, 66 N. J. Eq. (21 Dick.) 382; White* v. *Thomas Inflatable Tire Co., 52 N. J. Eq. (7 Dick.) 178; Loewenthal* v. *Rubber Reclaiming Co., 52 N. J. Eq. (7 Dick.) 440.* If the case turned upon this point, I think it would have to be decided in favor of the complainant, but it does not. If you deduct the fifty-two

thousand four hundred and thirty shares complained of from the four hundred and seventy-six thousand five hundred shares for which the management have proxies there will be left proxies against which nothing is alleged for four hundred and twenty-four thousand and seventy, which is nearly sixty thousand shares more than a mere majority. If, therefore, an injunction should run against the voting of the fifty-two thousand four hundred and thirty shares, it will cut no possible figure in the election for the reason above stated.

It is quite apparent that if these figures are correct, there is nothing for an injunction to protect. There is no charge of fraud or collusion on the part of the present management, and there does not appear to be any irreparable injury growing out of the situation. It is said that the board of directors, by means of a proxy committee, have canvassed the whole field of stockholders for proxies running in the name of three of the officers and directors of the company to vote for the present management, and that at the same time the same board has appointed three inspectors of election who are mere employes of the company and subject to the direction of the officers, and who therefore can have no independent judgment in making a decision upon the admission or rejection of a challenged vote, and that this amounts in law and in equity to appointing the present management to be judges in their own case. The practice referred to stands upon the ground of inveterate usage. It is sustainable only upon the ground that they hold the election fairly and honestly and neither commit or permit any fraud to be perpetrated upon the minority stockholders. Ordinarily speaking, the tellers or inspectors of the election at a corporation meeting perform only ministerial duties, and notwithstanding the elaborate by-law on the subject in this case, I do not see how they can be given judicial duties; they certainly cannot be given judicial duties which will override or in any way interfere with an inquiry by the supreme court into the regularity of the company's action.

This view of the case makes it unnecessary for me to discuss the question of the appointment of a master in chancery to superintend the meeting as was done by Judge Caldwell in *Bartlett* v.

*Gates, 118 Fed. Rep. 66*, and as was approved of by the supreme court of Pennsylvania in *Tunis* v. *Hestonville Railroad Co., 24 Atl. Rep. 88;* but I am constrained to say that in my opinion the cases called to my attention on behalf of the complainants in this connection do not go to the extent claimed. Chancellor McGill, in *Archer* v. *Amercian Water Works Co., 50 N. J. Eq. (5 Dick.) 33*, evidently meant to say that the power of the court of chancery to protect corporate elections would be exercised by means of injunctions, and such is undoubtedly the meaning of the opinion of Chancellor Pitney in *Warren* v. *Pim, 66 N. J. Eq. (21 Dick.) 382*. The statement made by Chancellor Runyon in *Lehigh Coal and Navigation Co.* v. *Central Railroad Company of New Jersey, 35 N. J. Eq. (8 Stew.) 353*, as to the exercise of the power of the court to provide for corporate elections, refers to the affairs of a railroad company which were being administered by the court of chancery by a receivership, which gave the court such control over the affairs of the company that it had power to order an election as part and parcel of its plan of management.

The motion will therefore be denied.